UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X----------------------------------------------------X

UNITED STATES OF AMERICA,              Index No. 19-cr-821 (KMW)

        -v.-

ALEXANDER DEJESUS,

        Defendant.
X----------------------------------------------------X


## ALEXANDER DEJESUS'S MEMORANDUM IN AID OF SENTENCING


LAW OFFICES OF
DANIEL A. MCGUINNESS, PC
Daniel A. McGuinness
260 Madison Avenue, 17th Floor
New York, NY 10016
Attorney for Mr. Dejesus

## Table of Contents

Introduction _____ 1

Alexander DeJesus's Personal History and Characteristics _____ 1

Alex Should be Sentenced to a_____ 6

Term Significantly Below the Guidelines _____ 6

   A.   The Guidelines Suggest a Sentence of Incarceration that is
Far Greater Than Necessary to Achieve the Ends of Justice
in this Matter. _____ 6

   C.   Alexander DeJesus's Sentence Should Vary Downward to
Reflect his Personal History and Characteristics. _____ 10

   D.   Harsh Pretrial Incarceration in the MCC and MDC Warrants
a Downward Variance _____ 11

Conclusion _____ 14

## Table of Exhibits

A        Support letter from Albania Cruz

B        Support letter from Alexander Dejesus Sr.

C        Support letter from Lourdes Cruz

D        Support letter from Sonaly Garcia

E        Support letter from Sonilvia Garcia

F        Support letter from Desireth Melo

G        Support letter from Destiny Sanchez

H        Support letter from Kirsis Vasquez

I        Support letter from Karina Santos

J        Support letter from Ashley Casanova

K        Support letter from Fernando Gaton

L        June 22, 2021 Statement of Department of Justice to Senate Judiciary
         Committee

## Introduction

Alex Dejesus didn't complain about living on a couch. His mother and siblings slept on mattresses crammed in a room the size of a walk-in closet. He kept a positive attitude and just helped any way he could. His father was gone and he took it on himself to be the man of the house and keep everyone's spirits lifted.  It was only after his own son was born that he truly felt the financial strain. He wanted his son to have all the things that he wanted but hadn't asked for. After two soul-wrenching years of not seeing his son in person, all he wants is to be back in his son's life.

## Alexander DeJesus's Personal History and Characteristics

Albania Cruz had just graduated high school when she learned she was pregnant. The father, Alexander DeJesus, was her high school sweetheart from John F. Kennedy High School in the Bronx. They decided to name their child after him. In March 1992 at Allen Pavilion Hospital in Manhattan 17-year-old Albania Cruz gave birth to her first child, Alexander DeJesus, Jr. The couple was not married and lived with Albania's parents for support. They separated two or three years after their son was born.

Alex, Sr. gave some support when he could, but Albania had to work hard to make ends meet. Albania's parents helped with housing and childcare. She worked long hours at various fast-food restaurants and dinners to support her young son. The long schedule of hard work continued as Albania's family grew.

1

About three years later, Albania gave birth to her second child with a different father. About three years after that, Alex's second sister was born. Several years later, two more maternal half-siblings were born, a sister who is now 13 years old and a brother who is now 11-years-old.



Alex (top left) with his son, mother, siblings and grandmother.

When Alex was a child, the apartment was home to Albania's parents, Albania and her children, as well as Albania's brother and sister at various times. The family grew, but apartment they lived in did not. Albania and her children still

live in the same one-bedroom apartment that she lived in with her parents back when Alex, Jr. was born. The bedroom is on the first floor of a large apartment building. The front door opens into a short hallway with the kitchen on the left and a small coat closet on the right. The hallway ends in a modest living room, with a single bedroom behind it and a single bathroom.

A partition was erected in the living room to section off an area to serve as a makeshift second bedroom. The wall was erected approximately three feet from the right wall of the living room – just wide enough to get a twin mattress inside.  The bunkbeds placed inside this new "bedroom" touched the walls on three sides and had to be entered from the feet of the beds. At the time of Alex's arrest, his grandparents occupied the main bedroom; his mother shared a bed in the makeshift bedroom with his youngest brother, and his three sisters shared a different bed in the same makeshift bedroom; and Alex, Jr. slept on the couch. Alex sought to be outside the cramped apartment as often as he could.

The family apartment on 204th Street is in Inwood neighborhood on the northern tip of Manhattan. The neighborhood has always been plagued with crime even during periods of relative safety throughout the city. A 1995 article in the New York Times Real Estate section promoting the neighborhood's low prices acknowledged: "[R]esidents warn against walking alone in the neighborhood at night" because of muggings. Maggie Garb, *If You're Thinking of Living In/Inwood; Life on the Northern Tip of Manhattan*, N.Y. TIMES, Jan. 22, 1995, § 9, at 5,

*available at* https://www.nytimes.com/1995/01/22/realestate/if-youre-thinking-of-

living-ininwood-life-on-the-northern-tip-of.html.

Even as crime rates fell around in the early 2000s, Inwood residents had a

different experience. In a 2002 letter to the editor of the N.Y. Times, an Inwood

resident wrote:

> In Inwood, it is not our imagination that crime is on the rise, but
> the police don't seem to acknowledge this. A particular problem is
> Isham Park, near 211th Street and Broadway. Recently, vandals
> sprayed graffiti, including swastikas, on sidewalks, benches and
> trees. Drug users congregate in the park and residents fear to
> walk there. When people tell the police about these activities, they
> often seem dismissive.
>
> A few days ago a young woman ran out shouting that she'd been
> mugged at gunpoint. We called the 34th Precinct but the phone
> rang for several minutes with no answer. By now, residents aren't
> surprised when this happens and have stopped reporting some
> incidents.

Angie Wojak, Letter to the Editor, N.Y. Times, Dec. 1, 2002, *available at*

https://www.nytimes.com/2002/12/01/nyregion/crime-on-the-mind-why-people-

worry-despite-the-statistics.html. The disconnect between the rosy crime statistics

and the lived reality of criminal activity in Inwood persisted for many years. *See*

Jennifer Steinhauer, *Angry Crowd Scolds Mayor on Crime Rate Far Uptown*, N.Y.

Times, Oct. 20, 2004, at B1, *available at* https://www.nytimes.com/2004/10/20/

nyregion/angry-crowd-scolds-mayor-on-crime-rate-far-uptown.html (discussing

Inwood residents complaining of increased crime in their neighborhood as Mayor

Bloomberg reported lowering crime statistics).

Inwood itself is sharply divided by race and class. Broadway runs through the middle of the neighborhood creating West Inwood and East Inwood. The households in West Inwood are predominately white and middle class. East Inwood where Alex lived has a far higher percentage of poverty and is a majority Hispanic neighborhood. *See* Nigel Chiwaya and Carolina Pichardo, *Inwood is Actually Two Neighborhoods Divided by Race, Class and Broadway*, DNAInfo, July 19, 2016, *available at* https:// www.dnainfo.com/new-york/ 20160719/inwood/inwood-is-actually-two-neighborhoods-divided-by-race-class-broadway. This divide has led to longstanding complaints from East Inwood residents that they received less access to information, police attention and other community resources. *Id.*

As a child and pre-teen growing up in East Inwood, Alex, Jr. saw his neighborhood rife with drug dealing, violent crime and robberies. His area was adjacent to several popular nightclubs. It was known to be a place where people could buy drugs for a night out.

At 16-years-old, Alex, Jr. learned that his father had been arrested and charged with selling illegal firearms to an undercover ATF Special Agent. Alex, Sr. was charged in *United States v. Alexander DeJesus*, 08-cr-54 (WHP) with violating 18 U.S.C. 922(a)(1)(A). Alex, Jr. recalls visiting his father in the Metropolitan Detention Center–the same facility where he is currently housed. His father was eventually sentenced to 12 months and a day of incarceration.

Alex, Jr. was 21-years-old when his son was born. He badly wanted to give his son not just what he needed, but more. The financial pressures of providing his

son seamed especially pronounced in the face of the conspicuous, lavish spending of the drug dealers on his block. Alex eventually made the horrible decision to enter the drug trade. As part of his dealing drugs, he purchases a revolver with three bullets which he kept in a closet.

**Alex Should be Sentenced to a
<u>Term Significantly Below the Guidelines</u>**

**A.  The Guidelines Suggest a Sentence of Incarceration that is Far Greater Than Necessary to Achieve the Ends of Justice in this Matter.**

"It has long been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).  The legal framework for a sentencing court to accomplish this difficult task is codified as Section 3553(a) of Title 18 of the United States Code.

Section 3553(a) specifies the factors that courts are to consider in imposing a sentence. *Dean v. United States*, __ U.S. __, 137 S. Ct. 1170, 1175 (2017).  The list of factors is preceded by what is known as the parsimony principle, a broad command that instructs courts to "impose a sentence sufficient, but not greater than necessary, to comply with" the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation.  *Id.*  A sentencing court is then directed to take into account "the nature and circumstances

6

of the offense and the history and characteristics of the defendant," as well as "the need for the sentence imposed" to serve the four overarching aims of sentencing. *Id.*

The Guidelines, once mandatory, now serve as one factor among several that courts must consider in determining an appropriate sentence. *See Gall v. United States,* 552 U.S. 38, 59 (2007). At sentencing, the judge "may not presume that the Guidelines range is reasonable." *Id.* 50. "Extraordinary circumstances" are not required to justify a sentence outside of the Guidelines range. *Id. at* 47. Sentencing courts must consider and respond to nonfrivolous arguments asserting that the Guideline sentence itself reflects an unsound judgment because it fails to properly reflect § 3553(a) considerations, does not treat defendant characteristics in the proper way or a different sentence is appropriate regardless. *United States v. Rita,* 551 U.S. 338, 357 (2007). District courts are no longer required, or permitted, to simply defer to Commission policies. *Id.*

In this case the Guidelines calculation set forth in the plea agreement and the PSR overstate his culpability in this case because they apply the crack Guidelines and not the powder cocaine Guidelines. The Department of Justice acknowledged the unwarranted racial disparities caused by the different treatment of crack and cocaine under the law in its support of the passage of the Eliminating a Quantifiably Unjust Application of the Law ("EQUAL") Act. *See* Ex. Statement of the U.S. Department of Justice ("DOJ") Before the Committee on the Judiciary, United States Senate, June 22, 2021, Ex. L. The DOJ stated:

> The research is clear that crack and powder cocaine are two forms of the
> same substance, and powder cocaine can readily be converted into an

equivalent amount of a substance containing crack cocaine. Indeed, under current law, a high-level dealer caught with three-quarters of a pound of powder cocaine that he plans to convert into an equivalent amount of crack cocaine may face a lower sentence than the street-level dealer caught with an ounce of already-converted crack cocaine. That makes little sense and is not fair.

*Id.* At 4-5. Alex is the street-level dealer caught with the already-converted crack cocaine. He should not face the inflated penalty of the guidelines that the Government concedes "makes little sense and is not fair."

Applying the powder cocaine guidelines, Alex's base offense level would be a level 18 instead of a level 30. His applicable offense level would be 17, and at a Criminal History Category I, his Guidelines range would be 24-30 months. A downward variance to time served would account for the unfair disparity in the crack and powder cocaine guidelines.

### B. A Significant Downward Variance is Proper to Avoid Unwanted Disparities in Sentences.

The only two co-defendants sentenced to date in this matter are not similarly situated to Alex. Both Neury Abreu and Ivan Brea plead guilty to being leaders of the conspiracy, which Alex certainly was not. Both men also came before the Court with extensive criminal histories and were on parole when they committed the instant offense. Alex has no criminal history points.

More similarly situated defendants are found in related matters. On November 20, 2019, the Southern District of New York announced charges against 30 individuals for trafficking narcotics in the Washington Heights and Inwood

sections of Manhattan. *See* 30 Defendants Charged With Narcotics and Firearms Offenses in Manhattan Federal Court, S.D.N.Y. Press Release (Nov. 20, 2019), https://www.justice.gov/usao-sdny/pr/30-defendants-charged-narcotics-and-firearms-offenses-manhattan-federal-court. The 30 defendants were split between five cases in this District: *United States v. Alexander Melo*, 19 Cr. 818; *United States v. Mario Delgado*, 19 Cr. 817; *United States v. Roberto Sanchez*, 19 Cr. 820; *United States v. Alberto Marte*, 19 Cr. 795; and the instant case, in which Alex is charged.

Juan Peralta, charged in *United States v. Alexander Melo*, 19 Cr. 818(PGG) plead guilty to distributing at least 280 grams of crack cocaine. Mr. Peralta came before the Court with three criminal history points, placing him in a Criminal History Category II. The Guidelines for Mr. Peralta were 63 to 78 months, and probation recommended a downward variance to 42 months. In its sentencing submission, the Government acknowledged the Mr. Peralta's difficult upbringing and challenging economic circumstances. It also recognized the DOJ's June 22, 2021 support of the EQUAL Act and advised that the "Court can and should, consistent with the law and sentencing framework, consider the powder-to-cocaine base disparity in assessing the 3553(a) factors." *See* September 24, 2021 Government Sentencing Letter, *United States v. Juan Peralta*, 19 Cr. 818(PGG), ECF No. 118 at 4. The Government calculated that under the cocaine powder Guidelines Mr. Peralta's Guidelines range would be 15 to 21 months' imprisonment. The Court sentenced Mr. Peralta to a time served sentence of approximately 23 months.

Alex, like Mr. Peralta, is at the bottom rung of the drug dealing ladder. His crime was one of poverty and desperation to provide for his family. Alex should not have to suffer a harsher sentence simply because he is at the bottom of the ladder and dealt with the drugs after they were cooked. As with Mr. Peralta, he should receive a variance within the powder Guidelines range.

### C. Alexander DeJesus's Sentence Should Vary Downward to Reflect his Personal History and Characteristics.

The Supreme Court has observed the central importance of the tailoring of each sentence to the individual before the court: "The punishment should fit the offender and not merely the crime." *Pepper*, *supra*, 562 U.S., at 487. As demonstrated by the many letters of support from his loved ones, Alex is a caring and kind son. He is a loving and supportive father. He is a helpful and reliable friend.

His mother describes him as a "caring, sweet boy" who helped around the house and even helped the neighbors with bringing in groceries and walking their dog. *See* Letter from Albania Cruz, Ex. A. His father similarly describes Alex as "sweet and caring" who always did his chores. *See* Letter from Alexander DeJesus, Sr., Ex. B. His Aunt calls him "a sweet boy" who has "a great heart." *See* Letter from Lourdes Cruz, Ex. C. She also recalls his helping elderly people in the neighborhood with daily activities.

Alex's love for his family is what stands out to his cousin Sonaly Garcia. *See* Letter from Sonaly Garcia, Ex. D. His other cousin, Sonilivia Garcia, states that

10

Alex is "extremely dedicated to his family" especially his son. *See* Letter from Sonilivia Garcia, Ex. E. The letters from his family unanimously recount that Alex is a dedicated and loving father to his 8-year-old son. Alex's girlfriend, Desireth Melo, reports that Alex is also a supportive and loving stepfather to her daughter. *See* Letter from Desireth Melo, Ex. F.

Alex gave help and support to his friends as well as his family. His long-time friend Destiny Sanchez describes how he would help her with her homework. *See* Letter from Destiny Sanchez, Ex. G. Kirsis Vasquez entrusted Alex to help to watch her son when she worked. *See* Letter from Kirsis Vasquez, Ex. H. Karina Santos knew that Alex would always be there to support her. *See* Letter from Karina Santos, Ex. I. Ashley Casanova misses Alex and the kindness he showed to her children, even bringing them Christmas presents. *See* Letter from Ashley Casanova, Ex. J. Fernando Gaton recalls Alex helping him with food when he needed it most. *See* Letter from Fernando Gaton, Ex. K.

### D. Harsh Pretrial Incarceration in the MCC and MDC Warrants a Downward Variance

Alex was confined at the Metropolitan Correctional Center ("MCC") from November 2019 until approximately October 2021, at which point he was transferred to the Metropolitan Detention Center ("MDC") in Brooklyn, NY along with many other prisoners. As this Court is aware, the reason for the transfers was the shutdown of the MCC due to its intolerable conditions. *See e.g.*, Noah Goldberg, *Manhattan Federal Jail where Epstein Killed Himself to be Empty by End of the*

11

*Week*, NY DAILY NEWS, Oct. 14, 2021, https://www.nydailynews.com/new-york/ny-manhattan-federal-jail-empty-end-of-week-mcc-closure-20211014-fupegmqetrg2fkwgh5kmfz55li-story.html.

Even prior to the pandemic, the MCC and MDC presented harsh conditions. Infestations, mold and undercooked food are normal parts of life for inmates. The facility offered few educational programs or opportunities for self-improvement. With the COVID-19 pandemic, things became far worse.

The draconian conditions put into place at the MCC and MDC to combat COVID-19 are well known to this Court. Inmates were held in their cells around the clock, with limited to no access to shower or email. Alex ate cold food inside his cell for every meal. Commissary stopped making rounds. He was barely able to even speak with his loved ones, as phone calls were limited. For two years, Alex has been unable to see his 8-year-old son.

The horrific conditions at the MDC and MCC have led numerous other courts in this district and in the Eastern District to issue downward variances. *See e.g.*, *United States v. Searles*, No. 19-cr-381 (GBD) (S.D.N.Y. Mar. 25, 2021) (imposing 48-month sentence in Hobbs Act robbery case where bottom of guidelines range was 120 months); *United States v. Marmolejo*, No. 20-cr-1 (JSR) (S.D.N.Y. Feb. 3, 2021) (imposing 18-month sentence where bottom of guidelines range was 87 months); *United States v. Almonte*, No. 19-cr-621 (RA) (S.D.N.Y. Jan. 14, 2021) (imposing 15-month sentence where bottom of guidelines range was 51 months); *United States v. Garcia*, No. 19-cr-593 (PAC) (S.D.N.Y. Dec. 3, 2020) (imposing 48-month sentence

where bottom of guidelines range was 110 months); *United States v. Camacho*, No.
19-cr-389 (CM) (S.D.N.Y. Nov 19, 2020) (imposing time-served sentence where
bottom of guidelines range was 57 months); *United States v. Paulino*, No. 19-cr-607
(AJN) (S.D.N.Y. Oct. 21, 2020) (imposing time-served sentence where bottom of
guidelines ranges was 27 months); *United States v. Cirino*, No. 19-cr-323 (JSR)
(S.D.N.Y. July 21, 2020) (imposing 10-month sentence where bottom of guidelines
range was 57 months); *United States v. Aracena de Jesus*, No. 20-cr-19 (PAE)
(S.D.N.Y. July 1, 2020) (imposing time-served sentence where bottom of guidelines
range was 30 months). *See also*, *e.g.*, *United States v. Clark*, No. 20-cr-241 (NGG)
(E.D.N.Y. May 7, 2021) (imposing 96 months in armed robbery case where bottom of
guidelines range was 114 months); *United States v. Narcissi*, No. 20-cr-449 (RPK)
(E.D.N.Y. Mar. 15, 2021) (imposing time-served sentence of 7 months, where
guidelines range was 24-30 months); *United States v. Colon*, No. 15-cr-317 (MKB)
(E.D.N.Y. Nov. 20, 2020) (imposing 18 months, consecutive to defendant's 18-month
state sentence, where bottom of guidelines was 100 months); *United States v. Shi*,
No. 19-cr-451 (PKC) (E.D.N.Y. Nov. 2, 2020) (imposing no prison where guidelines
range was 12-18 months); *United States v. Piper*, No. 18-cr-008 (AMD) (E.D.N.Y.
June 25, 2020) (imposing time-served sentence on resentencing where defendant
had served approximately 24 months and bottom of guidelines range was 63
months).

A similar downward variance is undoubtedly appropriate here. Alex's
experiences of being held, in what essentially constituted solitary confinement, are

far harsher than anyone deserves. This intensely grim time deserves considerable

weight in fashioning the appropriate sentence.

**Conclusion**

For the reasons stated above, respectfully requests that the Court sentence

him to a term of time served.

Dated: New York, NY
      February 16, 2022

Respectfully submitted,

Daniel A. McGuinness
260 Madison Avenue, Floor 17
New York, NY 10016
(212) 679-1990
dan@legalmcg.com

# EXHIBIT A

Albania Lucia Cruz

████████████████
New York , NY 10034
██████████████

To honorable judge

My name is Albania Lucia Cruz I am a mother of 5 children ages 29, 26,22,14 and 11, two boy 3 girls.
I am an employee at Riverdale Nursing Home as a therapeutic Recreation Director.

I am the mother of Alexander Dejesus he is my oldest son . The relationship between my son. Alexander
was born from a high school sweetheart relationship he was born with love , respect and family
oriented. We call  him junior . He was always  a caring sweet boy, use to help with house chores ,
respect house rules , help his brother and sister with HW and was respectful to me and others . My
parent help me raise him because he dad was not there all the time for me to be able to work and finish
school. I raise him as a single mom . He's dad would disappear for year them
Come back but I never talk any negative about his dad.
Alex school years was never a problem he would go to school like a normal student very bright he love
math. He did not graduate high school.
 Junior is know in the area that he grow up as a caring , helpful kids , never disrespectful to others .
He help one of our neighbor to caring her groceries, distribute candy that she use to sell for living and
always walk her dogs . He will also help mom with chores . He's my parents son too .
After he was an adult he started to build a relationship with his dad who is a pastor now , spending time
at the church when he visits, spending time with the sisters from the dad side and his dad families very
nice people and religious.
Junior has a son name ██ the best thing that ever happen to him . Your honor you have to see the love
and the bounding between those two person they love each other and the are very much alike .
██ favorite line to his dad is "daddy I love you to the moon and back a trillion time . They both love to
read , play video games and go out to places . He's a good dad . ██ can tell you that.
I have to say that this is the longest time I been away from my son it hurts so much I understand his an
adult but for a mom your child will always be a kid. For me his one of my precious treasure from god.
I take this time to say thank you for accepting my letter.

# EXHIBIT B

New Jersey, USA

November 22nd 2021

TO WHOM IT MAY CONCERN,

Hi, my name is Alexander De Jesus; my home is located at ████████ Cliffside Park, New Jersey 07010 for the last 18 years. Phone number ████████

I am Alexander De Jesus Jr.  Father;

I have been married to Divanni  De Jesus for the last 18 years, we have 3 Daughters that are Junior's Sisters ████████ , ████████ and ████████ De Jesus.

I work as a Manager at the Wendy's Restaurant for the last 3 years, Prior to working in Wendy's.  I spent 10 years working at Local Union 78 in NYC.
I have been married to Divanni De Jesus for the last 18 years, we have 3 Daughters and our only Son  is Junior.

 During all his youth years we will spend a lots of time together;  Junior  used to come over to stay with us at our home in New Jersey for the weekends;  he used to live with his Mom and go to school in New York.

As a family we used to take all of our kids, Including  Alexander De Jesus Jr.  On Summer trips to Six Flags great adventure In New Jersey;  Hersey Park, in PA;   Dorney  Park, PA , and many other Parks/places  to expend time together as a Family; we used to go out for Dinner together.

Junior and I played  basketball together every weekend, we spent long periods of times together during summer and any schools breaks, like Thanksgiving, Christmas, Birthdays and special occasions as Junior is my only Son and I have 3 girls.

 When Junior was a little boy he used to go with us to church; Church from which we became Pastors and until this day we are the Pastors of the church.

Junior is my only Son, He was always playful and happy ; he used to help my Wife  with my other kids, taking trash out, cleaning, shopping and doing all the chores at home. Junior is sweet and caring and his sisters love him a lot, our entire family love Junior and he is very special to us.

I just wanted to say  thank you for taking the time to  read my letter, I appreciate your time.

Respectfully yours,

Alexander  De Jesus

# EXHIBIT C

November 3, 2021

RE: Alexander De Jesus

Dear Honorable Judge:

I am writing this letter on behalf of my nephew Alexander DeJesus who is presently before you and is due to be sentenced.

I, Lourdes Cruz have known Alexander his entire life. Alexander was raised by his mother which is my sister and his grandparents. We all lived in the same household, so basically, I grew up with his not only as his aunt but as a big sister and babysitter. Alexander was always a sweet boy, he loved hanging with me and my friends as a kid, he would come with me to my softball games and many activities I had as a teenager. Growing up he was raised with lots of love and compassion. He comes from a Family with good morals values, our family has always believed in hard work, integrity, and goodwill toward others.

Alexander is a kind heart person who loves his family and is always willing to help others in need. Growing up I always remember him helping the elderly people from our neighborhood< with groceries, shopping carts and walking their pets. Alexander has an 8yr old son names ▓that he loves with all his heart and misses dearly, ▓misses his daddy so much and loves him and sees his daddy as his hero; Alexander has always been very involved in his son's life.

I can assure you that even though he has had up and downs in life, I and many of his family and friends are confident that Alexander is a human being with a great heart and a decent person. I'm sure that with all the support we will provide as a family he will change for the best. We will support him emotionally, spiritually and we will help him develop his self esteem and self confidence to become that amazing individual he was raised to be.

I can truly understand how difficult it is for you to have to make a decision of this type and under these circumstances, without really knowing the person in front of you, but I trust in God that you can look at this letter and feel All the support that his family and friends are trying to provide you. All this to tell you that we trust your wise decision, always considering the best for everyone.

Sincerely,

*Lourdes Cruz*

Contact information
Added by counsel:

▓▓▓▓▓▓▓

New York, NY 10034

▓▓▓▓▓

# EXHIBIT D

November 11, 2021

RE: Alexander De Jesus

Dear Honorable Judge

My name is Sonaly Garcia, I'm writing this letter on behalf of my cousin Alexander De Jesus.

Alexander and I grew up together we spent a lot of time together at our grandparents house , we used to celebrate every holiday together and go to family events , Alexander was always happy , he loved spending time with all his cousins and dance together.

Alexander is a sweet young men who loves his family specially his 8 year old son names ██. They were always playing and laughing together and I'm pretty sure Alexander can't wait to spend more good times with his son again.

I really hope that you will consider this letter before the court and give Alexander a second chance to spend time with his family again.

Sincerely

Sonaly Garcia

Contact information
Added by counsel:
████████████  ████ ██
New York, NY 10034
███████████████

# EXHIBIT E

Sonilvia Garcia

███████████

Yonkers NY 10701


November 14, 2021


RE: Alexander De Jesus


Dear Honorable Judge

My name is Sonilvia Garcia, I am a child care provider and I reside in Westchester County, I'm writing this letter on behalf of my cousin Alexander De Jesus.
As the oldest cousin I have witnessed him growing as a loving and responsible person with a kind heart and always willing to help others. He comes from a loving, hardworking family with good moral values. We always spent time together at our grandparent's house, and on all family events he was always present.


I can confirm that he is a man of integrity and extremely dedicated to his family especially to his 8 year old son names ███ which I'm sure he misses with all his heart, Alexander has always been very involved in his son's life and ███ depends and adores his daddy.


It is my sincere hope the court takes this letter into consideration at the time of sentencing , despite the current case , I still believe Alexandre De Jesus to be a great individual , valuable member of our family and a good human being .


Sincerely

Sonilvia Garcia

# EXHIBIT F

**Melo, Desireth**

**To:**          ██████████████████
**Subject:**     Supportive Family Client  Letter

October 29, 2021

To whom it may concern ,

My name is Desireth melo my adress is ███████████████ bronx ny 10457 ████ . My cellphone number is █████
████ please feel free to contact me at any time if needed . I am a mother to a 6 year old girl named ████ I am a fulltime
document processor in manhattan . I am not not married but I am in a relationship with Alexander . Me and Alexander met
13 years ago 2008 in his hometown park we have lots of mutrual friends which led us to meeting . We were first great
friends before anything involved .

    Me and Alexander saw eachother very often I would say about 4 to 5 times a week . I have lots of family who live near
by so we spent a lot of time together . I have not seen Alexander in two years now but I will be visiting very soon . during the
times we spent together we did many things such as spend time in the park go out to eat he has visited my home as well .
Our relationship was built on friendship and then over the years we became a couple . We may have not gone to same school
church  or organizations but we visited same places and we had lots of mutrual friends together . We were always together
he also was the type of man to make sure I got home safe our long walks were our favorite .

        My boyfriend is smart kind yes he is not perfect but he has always been there for me and my daughther no matter what
. For example , there have been times where I was struggling financially to feed myself and my daughter at one point and he
has gone above and beyond to make sure we ate and had food in our fridge . I can always count on him not only is he a
good friend partner but he is a wonderful father and step father to my daughter . Whitch my daughter cares very much for ,
He means everything and more to us he isnt someone I am just in a relationship with he is my family my bestfriend my
partner the man who has supported me through it all and hopefully one day my husband Godwilling . Alexander is an
important person in our lifes because he is the first person to meet my daughter . he has always been the type of man to
encourage me to finish school and without his help and encouranging words and stregnth I wouldn't have done it . I
remember he use to stay up with me on the phone and just talk for hours . He even helped  me build a closer relationship
with my mother and sibilings. So if writing this letter and supporting him through this process can help in any way I would do
it 1,000 times again after how much he has helped me and my family . Alexander has always been type of person to give
and help others before he helped himself he is a people person . He is a family man he loves his mother his sisters and he
loves all the kids in the family . He is a big kid at heart I have seen him myself go above and beyond for christmas just to
make sure all the kids have gotten everything they wanted . Alexander is a good man with beautiful soul nothing but love
support and caring inside and out I can go on and on about him and how he has blessed everyone that crosses paths with
him but unfortuanally I can not write a book .


        So to whom it may concern I want to take the time and say thank you very much for taking the time to read this letter it
trully means so much for our family and the Dejesus family . The best kind of people are the ones that came into your life and
make you see the sun where you once saw clouds. The people that believe in you too . The people that love you simply for
being you . The one in a lifetime kind of people and that is exactly what my partner is for me I love him for all he has done
and I know all he wants is to change his ways and become a better man for me and his family . So again thank you for giving
me your time .

Respectfully Submitted

*Desireth Melo (signature)*

Desireth Melo

1

# EXHIBIT G

My name is Destiny Sanchez, i am currently working at a chiropractor's office as an assistant and receptionist. I am engaged and do not have kids at the moment. I've known the client, Alexander DeJesus for more than 13 years. He is my closest friend's brother. I basically grew up with him; his grandmother would take care of me after school. I've gone to all family events so we would talk and spend time at these gatherings. We didn't attend the same school or anything he is a little older, but we did spend a lot of time while growing up in his grandparents' house.

Alexander has a very kind heart and always looked out for his family and would never miss a family gathering and the way he loves his son is out of this world. He is important to me because he is like family to me, growing up with him made me gain a special care for him. I am supporting him because again he is like family and I've seen how he is with his family and especially his son. Other than helping me with homework when we were growing up his was always a helping hand when needed, and his grandparents are the first to support me on that. He was always a big help around the house.

Alexander has a beautiful big heart, and anyone around him while being with his family and son would see it. I want to thank the judge for taking time out to read this letter and letting me express how Alexander is a good person at heart and never wished bad on no-one.

Respectfully submitted,

Destiny Sanchez

Contact information
Added by counsel:
████████████████
Bronx, NY 10460
████████████

# EXHIBIT H

November 2nd, 2021

Kirsis Vasquez

██████████████

New York, NY, 10034


RE: Alexander Dejesus


To Whom It May Concern,


My name is Kirsis Vasquez. I am writing on behalf of Alexander Dejesus. Mr. Dejesus and myself have been friends for over 10 years through his sister Shandee. We often saw each other on a weekly basis since his sister cares for my son. I saw how my son loved to be with Mr. Dejsus and I saw the love he has for my child. In this time, he has proven to be an upright and reliable character.

Mr. Dejesus is very important to myself because he has always cared for my son as if he was his own. I witnessed the bond between my son and Mr. Dejesus. He had a very special nickname for my son which was, "████████". Mr. Dejesus also helped me watch over my son on the days I would stay late from my work without any hesistations. I know he is dependable, respectful and courteous. He is by far one of the people I trust with my son and that says a lot.

It is my sincere hope the court takes this letter into consideration. Mr. Dejesus is like a brother to me, a good friend and a valuable human being for myself and his family but most importantly he is the most loyal and humblest person I know.


Respectfully submitted,

Kirsis Vasquez

# EXHIBIT I

**To Whom It May Concern:**


My name is Karina Santos; I first want to start by stating how I met Alexander Dejesus; we met through his sister which is my best friend. Alexander is an amazing human being, father, brother, son and friend! The times we have spent together has truly been magical and full of loving moments. We would do a lot of family/friends get together either in his house or mine. When I would miss a get together he would always call me to check in on me and see why I couldn't make it. We would also do a lot of outings with his son and my little brother and those are moments I would never forget. I missed his presence so much, especially when my father passed away in March 26, 2020 because I knew he would've definitely been by my side giving me the support I was needing. Finally, I want to thank the judge for taking the time to read my letter.


Respectfully submitted,


Karina Santos


Contact information
Added by counsel:
█████████
Bronx, NY 10458
█████████

# EXHIBIT J

November 22 , 2021

To whom it may concern  ,

My name is Ashley Casanova my address is ███████  Bronx NY 10467 ████ . My cellphone is ███████  you can contact me at any time . I am a mother to a 6 year old girl named ████  and twins ████  and ████ who are 3 years old . I am a full time mother I am not married . Alexander is a dear friend to me . I met alexander through his girlfriend Desireth 13 years ago in his home .

Me and Alexander saw each other very often because I was surrounded a lot by his girlfriend she is my bestfriend . I have not seen Alexander in 2 years but I look forward to seeing him its always good to catch up with my dear friend . From the times we spent together we spent times out to dinner and gatherings at Desireth apartment . Our relationship was brother and sister bond . We didn't attend same school or church but it felt like we knew each other more than 13 years we bonded instantly . He always had a great sense of humor .

  Alexander is a respectable man a kind friend always giving and loving and an amazing father . He is important to me because I know he is not a bad man and he wants to start over and become united with his girlfriend and family and leave the past behind him . Despite us growing as friends he became my brother no family is not perfect but in the end the love will always stay . Since I am his girlfriend close friend I have been around to see his kind gestors such as helping the elderly with groceries even bought my kids Christmas presents .

Thank you to whom it may concern for allowing me to write this letter letting you see my point of view of who Alexander is and what he meant to us .

Respectfully Submitted
Ashley Casanova

# EXHIBIT K

My name is fernando gaton. Alexander De Jesus and I have been friends for about 5 years. We met a little after I moved into the neighborhood of Inwood. We became good friends. I am a contractor with 8 years of experience in mounting and interior design CEO of Mounted BY FERNANDO LLC. I went to school for business administration and graduated. I was also in police academy but never finished because I realized I was destined to pursuit my dream of owning a business. I am currently married with 4 kids who are my world. We saw each other often and spoke about family and our experience as fathers. We are not biological brothers but our bond let us to feel as if we were.

What did we have in common specifically? We both have a heart for others in need and love our families. The fact our love and loyalty is as strong it brung us together because we could share similar experiences. Alexander  is important to me as I have grown to love and understand him over time. He has fed me when hungry and sheltered me when I experienced hardship.

I thank your Honor for reading this letter. There is a boy who awaits to one day be reunited with his father. His father must miss him and feel he need to be with his son. There are traits in junior that will allow him to keep becoming the person who he as a father would like to be in order to be the example his kid needs. Thank you and all my respects to your honor for allowing me to voice in his matter.

Contact information
Added by counsel:

█████████████

Yonkers, NY 10704

█████████████

# EXHIBIT L

# Department of Justice

STATEMENT OF THE
U.S. DEPARTMENT OF JUSTICE


BEFORE THE

COMMITTEE ON THE JUDICIARY
UNITED STATES SENATE


FOR A HEARING ENTITLED

EXAMIING FEDERAL SENTENCING
FOR CRACK AND POWDER COCAINE

PRESENTED

JUNE 22, 2021

**Statement of the**
**U.S. Department of Justice**
**Before the United States Senate**
**Committee on the Judiciary**
**For a Hearing entitled**
**"Examining Federal Sentencing for Crack and Powder Cocaine"**
**June 22, 2021**

**Introduction**

Mr. Chairman, Senator Grassley, distinguished members of the Committee —
thank you for holding this hearing and for giving the Department of Justice (the
Department) the opportunity to appear before you today to share our views on the
"Eliminating a Quantifiably Unjust Application of the Law Act" or the "EQUAL Act."
The Department strongly supports the legislation, for we believe it is long past time to
end the disparity in sentencing policy between federal offenses involving crack cocaine
and those involving powder cocaine. The crack/powder sentencing disparity has
unquestionably led to unjustified differences in sentences for trafficking in two forms of
the same substance, as well as unwarranted racial disparities in its application. The
sentencing disparity was based on misinformation about the pharmacology of cocaine
and its effects, and it is unnecessary to address the genuine and critical societal problems
associated with trafficking cocaine, including violent crime.

The U.S. Sentencing Commission brought this issue to the attention of the country
in 1995, when it issued the first of several reports laying out in great detail the research
around cocaine, its forms, routes of administration and effects, the marketing and
distribution of cocaine and its public health issues, and the crime associated with cocaine
trafficking.[1]  The Commission's data revealed for the first time that African-Americans
accounted for 88 percent of federal crack cocaine distribution convictions in 1993, and
that the sentences of those convicted of crack cocaine offenses were far more severe than
for those traffickers involved in similar quantities of powder cocaine. After careful and
comprehensive study of the issue, the Commission concluded that sentences for all forms
of cocaine trafficking needed to be strong to address the genuine harms caused by such
trafficking, but that the disparate treatment of crack and powder cocaine in federal
sentencing policy was not justified. In April of 1995, the Commission recommended that
the disparity be eliminated.

The Department believes it is long past time to accept the Commission's 1995
recommendation. There have been important steps taken in the intervening years to
reduce the disparity, but a disparity remains. As Arkansas Governor, former
Congressman, and former Administrator of the Drug Enforcement Administration Asa
Hutchinson recently wrote in an opinion piece, there is no worthier cause than preserving

---

[1] U.S. Sentencing Commission, *Special Report to Congress, Cocaine and Federal Sentencing Policy*
(February 1995).

1

our country's founding principle: that all are treated equally under the law.[2]  Governor Hutchinson urged passage of the EQUAL Act to end what he called "an old wrong."  The EQUAL Act has been endorsed by Democrats and Republicans, conservatives and liberals, senators and representatives.  These legislators know that our justice system must have the trust and confidence of the American people to be effective.  And a prerequisite for that is for our criminal and sentencing laws to be predictable, fair, effective, and not result in unwarranted racial and ethnic disparities.

The Department urges this Committee and the Congress as a whole to pass the EQUAL Act and to send it to President Biden for his signature.  The disparity in federal cocaine sentencing policy has been the most visible symbol of racial unfairness in the federal criminal justice system for almost 35 years, and it is time to eliminate it.

In the remainder of this statement, we describe why now is the time to enact the EQUAL Act – from the perspective of both fundamental fairness and public safety.

### Federal Drug Sentencing Policy

Criminal and sentencing laws, when crafted justly and through data-driven methods, provide both notice to the public of prohibited conduct and the consequences of engaging in such conduct.  When crafted effectively, they are also practical and effective tools for law enforcement, prosecutors, and judges to hold those who commit crimes accountable, deter future crime, and help make our communities safer.  Just *and* effective federal sentencing is critical to disrupting and dismantling the threat posed by drug trafficking organizations that too often plague our nation's streets: it is vital in the effort to reduce violent crime, child exploitation, sex trafficking and financial fraud; and it is essential to building trust and confidence in law enforcement and criminal justice.

Public trust and confidence are necessary elements of an effective criminal justice system – our laws and their enforcement must be fair and perceived as fair.  Unfairness, or the perception of unfairness, undermines governmental authority in the criminal justice process.  It leads victims and witnesses of crime to think twice before cooperating with law enforcement, tempts jurors to ignore the law and facts when judging a criminal case, and draws the public into questioning the motives of governmental officials and whether racism is at the heart of governmental systems.  When 77.1% of crack convictions in 2020 impact only members of a particular race or ethnicity—in this case Black people, who are thus disproportionally subject to the persisting sentencing disparity—that racial disparity greatly undermines fairness.[3]

---

[2] Governor Asa Hutchinson, *Gov. Asa Hutchinson: It's time to fix an old wrong and end the disparity between crack and cocaine offenses*, Fox News (June 8, 2021), https://www.foxnews.com/opinion/end-crack-cocaine-offenses-gov-asa-hutchinson.

[3] U.S. Sentencing Commission, *Quick Facts, Crack Cocaine Trafficking Offenses*, 2021, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Crack_Cocaine_FY20.pdf.

This Administration has already begun reviewing various criminal justice policies to bring about reforms that will both ensure that our law enforcement officers and prosecutors have the tools they need, not only to effectively respond to crime and help promote public safety, but also simultaneously to root out systemic problems, including unwarranted disparities in the criminal justice process.

A critical place to reform – and strengthen – criminal justice is federal cocaine sentencing policy. The EQUAL Act will do so, and that federal sentencing will more justly and effectively address dangerous drug trafficking across the country.

A. *Federal Sentencing Policy for Drug Trafficking Offenses*

Current sentencing policy for drug trafficking offensesf has its foundation in the Anti-Drug Abuse Act of 1986 ("the 1986 Act"). That statute established maximum and mandatory minimum penalties for persons convicted of trafficking in certain controlled substances. The 1986 Act pegged the mandatory minimums to specific quantities of drugs distributed. The quantities triggering the 1986 Act's mandatory minimum penalties differed for different drugs and in some cases for different forms of the same drug. The statute treated powder cocaine differently from crack cocaine by establishing what has come to be known as the 100-to-1 quantity ratio between the two forms of cocaine. In other words, in the 1986 Act, it took one hundred times as much powder cocaine as crack cocaine to trigger the same mandatory penalties. Under the 1986 Act, a person convicted of selling 5 grams of crack cocaine was treated the same as someone selling 500 grams of powder cocaine. The Sentencing Commission incorporated the quantity-based sentencing levels from the statute, including the 100-to-1 crack/powder disparity, into the federal sentencing guidelines.

There is a rational basis for tying penalties to drug type and quantity. An offense involving a larger quantity of a particular drug is ordinarily more serious than an offense involving a smaller quantity of the same drug. And different controlled substances can have different pharmacological effects in different quantities. So pound-for-pound, ounce-for-ounce, and gram-for-gram, under federal law and the sentencing guidelines, cocaine trafficking is generally sentenced more severely than marijuana trafficking; heroin trafficking is sentenced more severely than cocaine trafficking; and fentanyl trafficking is sentenced more severely than heroin trafficking.

But it is also critical to recognize that the statutory quantity-based triggers for drug trafficking penalties in federal law – and for base offense levels in the federal sentencing guidelines – are just part of sentencing policy for federal drug trafficking offenses. In addition to the quantity-based elements, statutory penalties and sentencing guidelines for drug traffickers are increased based on various aggravating factors present in particular crimes. For example, the guideline ranges are increased for those offenders convicted of possessing a gun in connection with a drug trafficking offense, for those who use a gun during the offense, for those involved in violence or who made a credible threat of violence, for those whose offenses result in death or serious bodily injury, for those with prior convictions for drug offenses, for those who are organizers or managers

of significant drug trafficking organizations, and for many other reasons.  Likewise, penalties may be reduced based on factors including assistance with law enforcement, minor or minimal role in the offense, or other mitigating factors.

This is a critical point, because there are indeed differences in the ways certain drugs are manufactured and trafficked.  Some forms of drug trafficking may correlate with higher rates of accompanying weapon possession, violence, or other aggravating factors.  And we believe that those differences are often significant enough that they should be accounted for in sentencing policy.  But those differences (unlike differences inherent in the drug's pharmacology) can be addressed through statutes and guidelines targeting violence, weapons, culpability level, and the like, rather than through quantity-based penalties.  This allows for targeting longer prison sentences for offenders whose conduct warrants them, and mitigated sentences for those that do not, rather than being overinclusive and sweeping in those for whom such sentences are unnecessary, unjust, and costly.

B.  *The Science of Cocaine: One Drug, Two Forms*

As the Sentencing Commission pointed out in 1995, when crack cocaine first appeared on U.S. streets, there was a belief that it was more dangerous than powder cocaine.  That belief drove Congress to treat crack and powder cocaine differently.[4]  But even by 1995, and especially in the years since, the evidence has demonstrated that powder cocaine and crack cocaine produce similar physiological and psychological effects once they reach the brain.  Whether in its powder or crack form, both types of cocaine are addictive, and both pose serious health risks.

According to the National Institute on Drug Abuse (NIDA), the key difference in cocaine's effects depends on how it is administered – by snorting, smoking, or injecting.  The intensity and duration of cocaine's effects, in any form, depend on the speed with which it is absorbed into the bloodstream and delivered to the brain.[5]  Smoking or injecting cocaine produces a quicker high than snorting it.  For that reason, the user who is smoking or injecting the drug can potentially become addicted faster than the user who is snorting the same substance.  Indeed, some studies have found that injected cocaine is absorbed into the bloodstream as rapidly as smoked cocaine.  The point is that differing methods of administration are what impact how rapidly powder or crack cocaine affects the body, not pharmacological differences between the two forms of the drug.

The research is clear that crack and powder cocaine are two forms of the same substance, and powder cocaine can readily be converted into an equivalent amount of a substance containing crack cocaine.  Indeed, under current law, a high-level dealer caught with three-quarters of a pound of powder cocaine that he plans to convert into an equivalent amount of crack cocaine may face a lower sentence than the street-level dealer

---

[4] U.S. Sentencing Commission, *Special Report to Congress, Cocaine and Federal Sentencing Policy* (February 1995).
[5] National Institute on Drug Abuse, *Cocaine DrugFacts,* April 2021, https://www.drugabuse.gov/publications/drugfacts/cocaine.

caught with an ounce of already-converted crack cocaine.  That makes little sense and is not fair.  It is for this reason that so many see the injustice in differing sentencing policy based on the form of the drug.  And it was for this reason that Congress in 2010 enacted the bipartisan Fair Sentencing Act that reduced the disparity from 100-to-1 to 18-to-1.  We are grateful for Congress's work in enacting the Fair Sentencing Act and the First Step Act, which made the reduced disparity retroactive.

C.  *Unwarranted Racial Disparities*

While these were welcome legislative steps, the racial disparities involved in federal cocaine sentencing policy persist, as do the unnecessarily severe sentences.  The Sentencing Commission reports that in fiscal year 2019, African-Americans accounted for 81% of federal crack cocaine convictions, and in fiscal 2020, they accounted for nearly 77% of convictions.[6]  Those convictions led to prison terms that were far longer than they would have been for equivalent amounts of powder cocaine.  During FY 2020, for example, federal crack cocaine offenders were sentenced to an average of 74 months, while the average powder offender was sentenced to 66 months; meanwhile, the median drug quantity for these crack offenders was 44 grams (less than 2 ounces), and the median drug quantity for powder cocaine was 5,200 grams, about 11 ½ pounds.  We are comparing a mean to a median because of technical limitations with the data, but the difference is obvious.

These racially disparate impacts of the crack-powder sentencing disparities are also evident through reflecting on the current federal prison population.  As of March 2021, Sentencing Commission data shows that 87.5% of the individuals serving sentences in the federal Bureau of Prisons for drug trafficking offenses, where the primary drug involved was crack cocaine, were Black.  That means almost 90% of the federal inmates still suffering from the effects of the disparity, today, are Black.[7]

Higher penalties for crack are also not necessary to protecting public safety.   As noted, the Sentencing Guidelines provide for specific enhancements that *are* tied to violence and public safety—such as additional enhancements for drug-trafficking that involves weapons, or additional penalties for having a leadership role in a trafficking organization.  All that is done by punishing the same amount of crack cocaine more harshly than the same amount of powder cocaine is the perpetuation of unwarranted sentencing disparities.   And in creating the Sentencing Guidelines, Congress explicitly required that the guidelines provide fairness in sentencing and reduce unwarranted sentence disparities.[8]

D.  *The Drug Trafficking Threat*

We want to make clear our view that cocaine and other illegal drugs pose serious risks to the health and safety of Americans.  Cocaine is a dangerous and addictive drug,

---

[6] U.S. Sentencing Commission, *Sourcebook of Federal Sentencing Statistics* (2020, 2021).
[7] U.S. Sentencing Commission, data provided to Department of Justice as of June 21, 2021.
[8] 28 U.S.C. § 994 (2021).

and its use and abuse can be devastating to families regardless of economic background or social status. Statistics on drug use, emergency department visits, violence, and many other indicators tell the story of tremendous harms caused by the illicit use of drugs, including cocaine. We must never lose sight of these harms, their impact on our society, and our responsibility to reduce illicit cocaine use.[9]

Moreover, transnational criminal organizations and drug trafficking organizations, have long posed an extremely serious public health and safety threat to the United States. The Department is committed to rooting out these dangerous organizations, and we are grateful to our law enforcement professionals who each day face grave dangers as they try to disrupt and dismantle these threats and improve public safety. Whether it is transnational drug cartels moving large quantities of powder cocaine into and through the United States, or the local distribution of crack in an American community, we aim our resources on dismantling these enterprises – and disrupting the flow of money both here and abroad – to help protect the American public.

In the fight against illegal drugs, we also recognize that vigorous drug interdiction must be complemented with a heavy focus on the prevention and treatment of substance use disorder. Today, many of those who come in contact with the criminal justice system in this country struggle with drug addiction, and many do not receive the treatment they need. When individuals returning from prison to their communities continue to struggle with addiction, they have a greater tendency to re-offend, as well as to feed the lucrative underground market for drugs.[10] We cannot break this cycle of recidivism without increased attention to prevention and treatment, as well as comprehensive prisoner reentry programs that promote sustained recovery.

It is only through a balanced and sophisticated approach – combining enforcement with robust prevention and treatment efforts – that we will be successful in stemming both the demand and supply of illegal drugs in our country. Strong and predictable sentencing laws are part of this balanced approach.

E. *Why the EQUAL Act Should Be Enacted Now*

There are many reasons why we think the EQUAL Act should be enacted now. First, the crack/powder disparity is simply not supported by science, as there are no significant pharmacological differences between the drugs: they are two forms of the same drug, with powder readily convertible into crack cocaine. Second, as documented by the Sentencing Commission, the crack/powder sentencing differential is still responsible for unwarranted racial disparities in sentencing. Third, the higher penalties for crack cocaine offenses are not necessary to achieve (and actually undermine) our law enforcement priorities, as there are other tools more appropriately tailored to that end.

---

[9] National Institute on Drug Abuse, *Cocaine Research Report* (2020),
https://www.drugabuse.gov/publications/research-reports/cocaine/what-cocaine.
[10] National Institute on Drug Abuse, *Overview of the Criminal Justice Drug Abuse Treatment Studies (CJ-DATS) Phase I & II*,
https://www.drugabuse.gov/research/nida-research-programs-activities/justice-system-research.

When crack cocaine offenses are associated with violence, there are provisions in the law and in the guidelines to address that violence and to ensure that those responsible are held accountable. When individuals serve as leaders of drug trafficking organizations or recruit young people into their conspiracies, federal law will direct higher penalties. And when repeat offenders don't get the message and continue to traffic, penalties are increased.

There are those who claim the current cocaine penalty structure (resulting in disparities) is justified because it accounts for a greater degree of violence and weapons involvement associated with some crack offenses, and because crack can be potentially more addictive than powder, depending on the usual method of use.

The Department shares these concerns about violence and guns used to commit drug offenses and other crimes associated with such offenses. We recognize that data suggest that weapons involvement and violence in the commission of cocaine-related offenses are generally higher in crack versus powder cases. This is largely because crack cocaine is sold at the retail-level, and violence is more often associated with retail sales. We believe that violence associated with any offense is a serious crime and must be addressed, but the best way to address drug-related violence is to ensure that increased penalties are meted out when those circumstances are present. We support the application of sentencing enhancements, under the guidelines, for those who use weapons in drug trafficking crimes, or for those who use minors to commit their crimes, or for those who injure or kill someone in relation to a drug trafficking offense, and the like. But we should not increase the penalties for an entire class of offenders, and there should not be a discount for trafficking in powder cocaine rather than crack cocaine.

Moreover, recent history has shown that even when penalties are reduced, many who are arrested continue to cooperate with the government and provide substantial assistance in the investigation and prosecution of others. The Sentencing Commission found that the rate of guilty pleas, and of substantial assistance departures, both remained largely constant before and after the guideline base offense levels for crack were lowered in 2007. Today, substantial assistance occurs slightly less often in crack cocaine trafficking cases than in powder cocaine trafficking cases and less frequently than in methamphetamine trafficking cases, but more frequently than in marijuana trafficking cases and more frequently than in all other federal criminal cases generally. Federal crack defendants continue to plead guilty in more than 95% of cases. In our experience at the Department, the changes in the law to date have not thwarted federal prosecutors in bringing crack prosecutions against significant dealers.

The proposed EQUAL Act would be an effective means of eliminating the persisting, unjust sentencing disparity that is still baked into federal law. Department prosecutors have applied the laws as passed by Congress to address serious crime problems in communities across the nation. But the Department—along with numerous other law enforcement leaders who have spoken out against the powder-crack disparity— believes that the most effective drug enforcement strategy is to deploy federal resources to disrupt and dismantle major drug trafficking organizations, especially when they use

violence to terrorize neighborhoods. That is our objective, and the crack-powder sentencing disparity does not help us achieve it.

F. *Retroactivity*

We not only support the provisions of the EQUAL Act that will eliminate the existing crack/powder disparity, we also support making this change retroactive. Unlike the Fair Sentencing Act, the EQUAL Act is explicit that it applies "to any sentence imposed after the date of enactment of this Act, regardless of when the offense was committed." It also has an explicit retroactivity provision, but retroactive relief under the Equal Act is not automatic. Rather, a federal judge would evaluate each individual's motion in light of the statutory sentencing factors, including the need to protect the public.

Applying the changes retroactively will ensure that no crack cocaine offender will serve a sentence greater than necessary.

We support retroactivity because it is the right thing to do, and because evidence shows that previous instances of retroactive penalty reductions did not impact public safety. The Sentencing Commission has twice studied recidivism among crack offenders who received retroactive sentencing reductions and concluded that offenders released early did not have higher rates of recidivism than crack offenders who had served their full sentences. Furthermore, retroactive relief under the Equal Act would not automatic; rather a federal judge would evaluate each individual's motion in light of the statutory sentencing factors, including the need to protect the public.

Passing the EQUAL Act would also help to ensure that all crack cocaine offenders who were negatively affected by the old 100-to-1 crack-to-powder ratio receive the opportunity for a sentence reduction. The Supreme Court recently ruled in *Terry v. United States* that low-level crack cocaine traffickers are ineligible for a sentence reduction under the provision of the First Step Act that authorized retroactive application of the Fair Sentencing Act. Under the Supreme Court's ruling, and according to Sentencing Commission data, approximately 230 crack cocaine offenders who are still serving sentences under the pre-Fair Sentencing Act statutory and Guidelines regime are ineligible for a sentence reduction, whether or not their sentence was affected by the 100-to-1 ratio. Under the EQUAL Act, those defendants would get the chance to ask for a reduced sentence.

We support the bill's intent to make its changes retroactive. The Department looks forward to working with you on improving the technical aspects of the retroactivity provisions.

**Conclusion**

For the reasons outlined above, the Department believes that the current federal cocaine sentencing structure is wrong and must be changed. It fails to reflect the

identical pharmacological properties of crack and powder cocaine, nature of the offenses involving the drug that cause the most harm, and the goal of sentencing only major traffickers to the most severe prison sentences. We believe that the current structure is unjust. Passing the EQUAL Act will help eliminate the sentencing disparity – in the quantity-based foundational sentences – between crack cocaine and powder cocaine.

As the history of this debate makes clear, there has been disagreement about whether federal cocaine sentencing policy should change, and, if so, how it should change. But the history also shows that members of both political parties, law enforcement, and community groups can all come together to find a policy that is fair and just, racially equitable, effective in promoting public safety, and addresses the real concerns around drug trafficking. This Administration and its components, including the Department and the Office of National Drug Control Policy, look forward to working with this Committee and members of Congress in both chambers to develop sentencing laws that are effective, smart, fair, and perceived as such by the American public. Our goal is to ensure that our sentencing system is predictable and even-handed, and as such, promotes public trust and confidence in our criminal justice system. Ultimately, we all share the goals of ensuring that the public is kept safe, reducing crime, and minimizing the wide-reaching, negative effects of illegal drugs. To begin this effort, Congress must pass the EQUAL Act.